UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| MORNING STAR LLC, | ) Case No. 2:22-cv-04973-JVS-MAR |
|     Plaintiff/Counterdefendant, | ) |
| | ) FINDINGS OF FACT & |
| v. | ) CONCLUSIONS OF LAW |
| | ) |
| KEITH B. CANTER, et al., | ) |
|     Defendants/Counterclaimants | ) |
| | ) |
| | ) |

Plaintiff and Counterdefendant, Morning Star LLC ("Morning Star"), alleges that Defendants and Counterclaimants, Keith B. Canter ("Canter") and Karen Elise Schoen ("Schoen"), Trustees of The Canter Schoen Family Trust U/T/D March 17, 2015 (collectively, "Trustees"), knowingly and willfully violated the 1994 Restrictive Covenant by constructing a second story on their property. Having carefully considered and reviewed all the testimonial and documentary evidence presented by the parties in the matter, the Court now enters the following findings of fact and conclusions of law. Fed. R. Civ. P. 52.

## I. Jurisdiction & Venue

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332: as the parties are diverse and the matter in controversy, exclusive of interests and costs, exceeds the sum or value of $75,000. The Court has personal jurisdiction over the parties, and venue is proper in this Court pursuant to 28 U.S.C. § 1391 because some of the events giving rise to this action occurred in this judicial district and because Defendants reside and/or do business within this District. This matter is properly before this Court pursuant to the Court's Order for Court Trial. (Dkt. Nos. 138, 139.)

## II. Procedural Background

2. Morning Star filed this lawsuit on July 20, 2022, seeking to broadly enforce the 1994 Restrictive Covenant. (Complaint, Dkt. No. 1; First Amended Complaint ("FAC"), Dkt. No. 15.) On October 7, 2022, the Trustees filed a counterclaim against Morning Star for a separate violation of the 1994 Restrictive Covenant. (Dkt. No. 48.) Some claims were resolved by way of summary judgment. (Dkts. No. 121, 134.) The only remaining issues are the meaning of the one-story restriction in the 1994 Restrictive Covenant; whether Trustees knowingly and/or wilfully violated the 1994 Restrictive Covenant; and what remedy, if any, should be met out for violation of the 1994 Restrictive Covenant. (Dkt. Nos. 121, 134, 185.) In a three-day bench trial, held on December 5, 2023, to December 7,

2023, the parties presented live testimony and exhibits.  The parties submitted proposed findings of fact and conclusions of law.  (Dkt. Nos. 186, 187.).

### III. FINDINGS OF FACT

3.     As a preliminary matter, the Court addresses the credibility of the two key party witnesses: Patrick Nazemi, resident of the Morning Star Property, and Karen Schoen, co-trustee of the Trustee Property.  Both were frequently non-responsive and evasive in their answers.  Moreover, Schoen and Nazemi at times were both petulant and belligerent in their responses.  Where the Court has made factual determinations on disputed issues, it gives both witnesses' testimony substantially reduced weight.  This is particularly true with regard to Nazemi. After the Court repeatedly admonished Nazemi to directly answer the question put to him, the Court sanctioned Nazemi $100, which he promptly paid.

### A.     The Parties and Properties

4.     Morning Star is a limited liability company formed in the State of Nevada.  (12/6 Tr. Vol. II 74:9-10.)  The sole member of Morning Star is Nevada Reliable Trust.  (Declaration of Patrick Nazemi ("Nazemi Decl."), Dkt. No. 147, ¶ 5.)  At the time the lawsuit commenced, the trustee of Nevada Reliable Trust was Andrew McNeil, who is a resident of Nevada.  (12/6 Tr. Vol. II 61:14-18.)

5.     Morning Star is the owner of real property located at 6368 Sea Star Drive, Malibu, California, 90265, Tax Assessor's Parcel Number 4469-047-017 ("Morning Star's Property").  (Nazemi Decl. ¶ 4, Ex. 3.)  The legal description of Morning Star's Property is "Lot 17 of Tract No. 45585, in the City of Malibu, County of Los Angeles, State of California as per map recorded in Book 1171, Page(s) 84 through 88 inclusive of Maps, in the Office of the County Recorder of said County" ("Lot 17").  (Id.)

6.     Andrew McNeil acquired title to Morning Star's Property on August 21, 2020 by Grant Deed and recorded in the official records of the County of Los Angeles on August 25, 2020.  (Id. ¶ 9.)  Andrew McNeil transferred the property to

Morning Star on May 21, 2021.  (Id. ¶ 10; id., Ex. 3.)

7.    Morning Star acquired title to Morning Star's Property by Grant Deed, dated May 21, 2021, and recorded in the official records of the County of Los Angeles on June 16, 2021, from the previous owner of record Andrew McNeil. (Id. ¶ 4, Ex. 3.)

8.    Morning Star was created at Patrick Nazemi's ("Nazemi") direction for the purpose of holding title to Morning Star's Property.  (Id. ¶ 5.)

9.    Nazemi and his family leased and moved into Morning Star's Property in early September 2020 and have resided there since that time.  (Id. ¶¶ 2–3.)

10.   Trustees are residents of the County of Los Angeles, California. ((Declaration of Keith B. Canter ("Canter Decl."), Dkt. No. 159, ¶¶ 1, 4; Declaration of Karen Schoen ("Schoen Decl."), Dkt. No. 168, ¶¶ 1, 3; 12/5 Tr. Vol. II 95:24-25.)

11.   Trustees are the owners of real property located at 6362 Sea Star Drive, Malibu, California, 90265, Tax Assessor's Parcel Number 4469-047-016 ("Trustee's Property").  (Trial Ex. 4.)  The legal description of Trustee's Property is "Lot 16 of Tract No. 45585, in the City of Malibu, County of Los Angeles, State of California as per map recorded in Book 1171, Pages 84 through 88 of Maps, in the Office of the County Recorder of said County" ("Lot 16").  (Id.)

12.   Trustees acquired their property by Grant Deed dated February 21, 2018, which was recorded in the official records of the County of Los Angeles on April 20, 2018.  (Id.)  Trustees wanted a scenic ocean view for their property. (Schoen Decl. ¶ 5; Canter Decl. ¶ 6.)

13.   Morning Star's Property and Trustees' Property are adjacent parcels that share a property line along the north side of Morning Star's Property and the south side of Trustees' Property.  (Trial Ex. 9.)

14.   Trustees' Property was vacant and undeveloped when Andrew

3

McNeil acquired Morning Star's Property in 2020. (Nazemi Decl. ¶ 25.) There was an existing row of mature and tall Ficus plants located on Morning Star's side of the property line that spanned from just east of the mid-point of the shared property line and extended the entire length of the property line to the east ("Old Ficus"). (Id.; Trial Ex. 13.)

**B.     The 1994 Restrictive Covenant**

15.     On August 24, 1994, Saied T. Javid, the Executive Vice President of Diva Partners, LP ("Diva"), the Sea Star Estate's developer, executed and recorded a restrictive covenant running with the land for Tract Number 45585 (the "1994 Restrictive Covenant"). (Trial Ex. 1.)

16.     The 1994 Restrictive Covenant pertains to Morning Star's Property (Lot 17) and Trustee's Property (Lot 16) and imposes "certain restrictive covenants" on both properties for their mutual "privacy and benefit." (Id. at Recital B.)

17.     The restrictions at issue in this case are recited in full below:

> **Section 1. Northeast Corner of Lot 17.**  No improvement of any kind, size or type may be constructed, placed or maintained on or under the surface of that portion of Lot 17 of the Property described in Exhibit A [providing coordinates of "Northeast Corner"], attached hereto and incorporated herein by this reference.

> **Section 2. Fencing on Lot 17.**  No fence, barrier or landscaping of any type may be constructed, placed or maintained on (i) the northerly ten (10) feet of Lot 17 of the Property; or (ii) that area described in Section 1 of this Article II, which is (or in the case of landscaping which grows) to a height in excess of two (2) feet above the top of the foundation of a single family residence and/or appurtenant structures

4

constructed from time to time on Lot 16 of the Property.

**Section 3. Height Restriction on Improvements on Lot 16.**

No improvements of any kind, size or type may be
constructed, placed or maintained on Lot 16 of the Property
greater than eighteen (18) feet above the grade of Lot 16 of the
Property as reflected on the Tract Map of the Property, or
greater than one story in any event including but not limited
to, a residence, garage, or any other appurtenant structure or
outbuilding.

(Id. at Art. II, §§ 1–3.)

18.   In order to give effect to its provisions, the 1994 Restrictive Covenant states that the "Dominant Tenement"[1] has the right to enforce the Covenant's provisions against the "Servient Tenement by any proceeding at law or in equity." (Id. at Art. III, § 1.)

19.   "Dominant Tenement" is defined as "Lot 16 of the Property as to the restrictions set forth in Sections 1 and 2 of ARTICLE II," and "Lot 17 of the Property as to the restrictions set forth in Section 3 of ARTICLE II." (Id. at Art. I, § 2.)

20.   "Servient Tenement" is defined as "Lot 17 of the Property, as to the restrictions set forth in Sections 1 and 2 of ARTICLE II," and "Lot 16 of the Property as to the restrictions set forth in Section 3 of ARTICLE II." (Id. at Art. I, § 3.)

21.   The 1994 Restrictive Covenant also states that its restrictions "shall run with the land . . . unless an instrument signed by the then owner of the Dominant Tenement has been recorded, agreeing to change said restrictions in

---

[1] The 1994 Restrictive Covenant utilizes an incorrect spelling of "tenement." (See, e.g., 1994 Restrictive Covenant at Art. III ("Dominant Tenament").) The Court will use the spelling "tenement" throughout its findings of fact and conclusions of law.

whole or in part." (Id. at Art. III, § 2.)

22.    Morning Star's Property, Lot 17, is the Dominant Tenement. Trustee's Property, Lot 16, is the Servient Tenement, as defined in the 1994 Restrictive Covenant, for purposes of the one-story limitation. (See id. at Art. II, § 3.)

23.    The Court finds that the 1994 Restrictive Covenant constitutes a valid, binding, and enforceable contract and covenant that runs with the land.

24.    Under the restrictions in Article II, Section 3 of the 1994 Restrictive Covenant, Trustees, are restricted from constructing, placing, or maintaining improvements of any kind, size or type on Trustees' Property "greater than one story in any event including but not limited to, a residence, garage or any other appurtenant structure or outbuilding." (Id.)

25.    The Court finds that Morning Star has the right at law and in equity to enforce the restrictions imposed therein upon Trustees and Trustees' Property.

26.    The Court finds that the 1994 Restrictive Covenant is clear and unambiguous. The height limitations are twofold: one story and not greater than 18 feet.

**C.    The 2000 Restrictive Covenant**

27.    On November 14, 2000, an amendment to the 1994 Restrictive Covenant was recorded with Los Angeles County (the "2000 Amendment"). (Trial Ex. 5.)

28.    By that time, Diva had conveyed Lot 16 to Feridoon Ghasemieh ("Ghasemieh") but retained Lot 17. (Id. at Recitals C, D.)

29.    The 2000 Amendment, signed by both Diva and Ghasemieh, purported to modify Exhibit A of the 1994 Restrictive Covenant which defined the outer boundaries of Lot 17's "Northeast Corner." (Id. at Recital E; id., Ex. A.)

30.    The 2000 Amendment did not modify or amend any other term, covenant, or condition in the 1994 Restrictive Covenant. (Id.)

**D.    The 2004 Restrictive Covenant**

31.    On April 1, 2004, a Restrictive Height Covenant was recorded with Los Angeles County ("2004 Restrictive Covenant").  (Trial Ex. 104.)

32.    The 2004 Restrictive Covenant, signed by Ghasemieh and Richard and Tracey Nanula, restricted the height of any proposed construction on Lot 16 to one-story.  (Id.)

33.    The 2004 Restrictive Covenant concerned only Lot 4, the benefitted parcel, and Lot 16, the restricted parcel.  (Id., Exs. A–B.)

34.    The 2004 Restrictive Covenant stated: "For the purposes of this Covenant, One Story is defined as eighteen (18) feet in height as measured from the existing grade of the Restricted Parcel."  (Id. at 1.1.)

35.    The owner of the Dominant Tenement, Lot 17, of the 1994 Restrictive Covenant was not a party to the 2004 Restrictive Covenant.  (See generally id.)

36.    The Court finds that the 2004 Restrictive Covenant did not change the meaning of the one-story restriction in the 1994 Restrictive Covenant because only the "owner of the Dominant Tenement" can alter the restrictions in Article III, Section 2 of the 1994 Restrictive Covenant.  (Trial Ex. 1, Art. III, § 2.)  Moreover, there was no indication in the 2004 Restrictive Covenant of an intent to amend the 1994 Restrictive Covenant.

**E.    Trustees' Construction of the Two-Story Unit**

37.    Before Trustees closed on their purchase of the property, they received a copy of a Preliminary Title Report dated February 12, 2018 from Fidelity National Title Company.  (Trial Ex. 10; Trial Ex. 12 at 11; 12/5 Tr. Vol. I 57:4-22; Schoen Decl. ¶ 8; Deposition Testimony of Keith B. Canter ("Canter Depo."), Dkt. No. 149, at 82:22-83:21.)  The Preliminary Title Report identified and referenced the 1994 Restrictive Covenant recorded against Trustees' Property.  (Trial Ex. 10; 12/5 Tr. Vol. I 52:14-53:17, 54:15-55:8; 12/7 Tr. Vol. II 71:7-25; Canter Depo. at 82:22-84:03; Deposition Testimony of Karen Elise Schoen

("Schoen Depo."), Dkt. No. 150, at 75:09-24, 86:14-87:01, 102:09-13.)

38.    Trustees read the Preliminary Title Report when they received it from the Fidelity National Title Company.  (Trial Ex. 10; Trial Ex. 12 at 11; Canter Depo. at 83:15-21.)  Trustees admit that they eventually received a Title Policy that contained a working hyperlink to the 1994 Restrictive Covenant.  (12/5 Tr. Vol. I 57:4-59:7, 60:8-25; Trial Ex. 12.)

39.    When Trustees received and read the February 12, 2018 Preliminary Title Report for their property, they had constructive knowledge of the existence of the 1994 Restrictive Covenant recorded against their property.

40.    On March 4, 2019, Trustees submitted an application for approval of their 24-foot high residence to the City of Malibu.  Shortly after, the City of Malibu informed Trustees that the owners of Lot 4 objected to the height of their proposed residence.  (Trial Ex. 57.)

41.    During Trustees' negotiations with the owners of Lot 4, Trustees learned about the height restriction in the 2004 Restrictive Covenant.  (Trial Ex. 104; 12/6 Tr. Vol. II 45:10-18; 12/7 Tr. Vol. II 50:18-51:3.)

42.    Before the issuance of a building permit for Lot 16 and commencement of Trustees' construction of a two-story home, Trustees' project manager, Anna Mattioli ("Mattioli"), received an incomplete notice from the City of Malibu quoting the one-story restriction in the 1994 Restrictive Covenant.  (Trial Ex. 58.)  Schoen received a copy of the Incomplete Letter and was aware of its contents.  (Id.; 12/5 Tr. Vol. I 71:20-22, 72:9-18; Deposition of Anna Mattioli ("Mattioli Depo."), Dkt. No. 151, at 68:15-25, 69:09-70:02, 71:02-10.)

43.    Trustees knew about the 1994 Restrictive Covenant recorded against their property on May 5, 2020 when the City of Malibu notified Trustees that the one-story limitation in the 1994 Restrictive Covenant prevented them from building a two-story home.  (Trial Ex. 58; 12/5 Tr. Vol. I 73:25-75:07; 12/7 Tr. Vol. II 96:8-15.)

44.     The letter stated:

Our Planning Department Staff has completed a second review of the application and determined on May 5, 2020, that the application submitted was INCOMPLETE and will require further information.  To continue processing the application, please address the following items.

. . . .

**Deed Restrictions**

1.     According to Instrument 94-1566821 "No improvements of any kind, size, or type may be constructed, placed, or maintained on Lot 16 of the property greater than 18 feet above the grade of Lot 16 of the Property reflected on the Tract Map of the Property, or greater than one story in any event including but not limited to, a residence, garage, or any other appurtenant structure of outbuilding." (This was amended by 00-1778896, also attached.)  This restriction was reiterated in Instrument 2004-779967.  As such, the second floor must be eliminated from the plans.

(Trial Ex. 58.)

45.     Trustees admit that the home being constructed on their property is greater than one story.  (12/5 Tr. Vol. I 17:5-18:13, 21:4-12.)

46.     Between May 5, 2020 and June 19, 2020, Trustees directed their architect, Douglas Burdge ("Burdge"), their project manager, Anna Mattioli, and their lawyer, Justin Block, to email the City of Malibu planning department staff and the city attorney for a specific interpretation of the one-story limitation in the 1994 Restrictive Covenant.  (Trial Exs. 41, 42, 45, 48, 50, 51, 52.)

9

47.     On May 8, 2020, Mattioli sent Justine Kendall, the City of Malibu's Associate Planner, an email regarding the deed restriction.  (Trial Ex. 41.)  Trustees and Burdge were copied on this email.  (Id.)  In the email, Mattioli stated:

> 1.     I understand that you are applying the definition of "Story" per LCP CH. 2- Definitions, as "that portion of building included between the upper surface of any floor and the upper surface of the floor next above.."
>
> However, I believe that the definition of One-Story on this dee[d] restriction has another meaning and purpose.  If you read the latest (2004) recorded document, the definition of One Story refers to the height of the building (18'), not to the number of floors inside the building (see screenshot [of 2004 Restrictive Covenant]).  It's not a coincidence that only the last instrument has this clear definition of the 18' restriction, likely added to prevent potential misunderstandings to future property's owners.
>
> For the purpose of clarification our clients reach out to an attorney regarding the interpretation of the Deed restriction who confirmed that it would be acceptable to have a second floor as long as the overall height of the building won't exceed 18'.
>
> Please let us know if you wish to see the Attorney's response, Keith or Karen can follow up with you on this regard.

(Id.)  In that email, Mattioli also asked if Justine was available for a conference call.  (Id.)

48.     On May 8, 2020, Trustees informed Justine that the conference call would be to discuss (in order of importance):

>     - the pertinent facts surrounding the deed restriction

- the status of geology

- outstanding fees

(Trial Exs. 42, 45.)

49.    On May 8, 2020, Trustees directed Burdge to email the City to "rescue [their] project" by advocating for an interpretation of the one-story restriction that was inconsistent with the plain and ordinary meaning of one story. (Trial Exs. 41, 42; 12/5 Tr. Vol. I 79:9-80:10.)  Specifically, Trustees stated the following:

> In terms of the deed restriction, we believe the original 1994 height restriction in our deed followed the language Malibu use to use for height, in that it referred to 18 foot structures as 1 story, and 24 foot structures as 2 stories.  The 2004 height restriction in our deed clarified the verbiage (as Anna tried to explain to Justine) as being an 18 foot height restriction.

(Trial Ex. 41.)

50.    On June 1, 2020, Trustees sent Burdge and Mattioli a letter they drafted regarding their property.  (Trial Ex. 48.)  The letter stated:

> **Deed Restriction**
>
> Our original intent was to build our garage area to 24 feet to allow more headroom in the garage and our 4th bedroom.  We were advised by our architects that this would require special approval, but as we got into the planning process we learned of the deed restriction which was not evident to us when we purchased the land.
>
> We quickly sought legal and other counsel and learned about the vernacular used in Malibu 30 years ago when the city was incorporated.  Essentially, that 'one story' was used to describe 18 feet in height and 'two story' referred to 28 feet.

11

Our legal counsel advised us that we could build our proposed home including the 2nd story bedroom to 18 feet, but in order to go to 24 feet over our garage, we would need to revise the deed restriction with our neighbor.

**Dominant Property Owner Discussions**

Our first City Planner (before she left the city), Jessica Colvard, informed us that our neighbor had called into the city concerning our property and keeping it to 18 feet in height. After learning of this as well as the deed restriction, we decided to approach this neighbor about 1 year ago, to see if they would be open to changing the deed restriction and allow us to raise the height to 24 feet for the garage area only (the area where the second story is proposed).

We offered in exchange to limit landscape height over much of our property and to reimburse them for any legal costs for revising the deed.  These discussions went on for 6 months, and after stringing us along and delaying our project further, we learned in the end that they had no interest in revising the deed unless we moved the house footprint.  The requested house footprint move was something we could not accommodate due to environmental health requirements for our septic field.  While we tried to explain these requirements to them, they said without this they were not interested in changing the deed and asked that we no longer discuss it with them.

**Conclusion**

The intent of the deed restrictions are to limit the mass of our structure to 18 feet.  This is what the 2004 restriction sought to

1
2
3
4
5
6

> clarify.  The 18 feet height restriction is also the dominant
> property owners concern.  We find it nonsensical to further
> hold up our project due to outdated vernacular that was
> propagated by the City of Malibu 30 years ago, when it has
> zero impact on our neighbor if our garage is 18 feet high or if
> we choose to divide this mass in the interior into 2 levels.

7  (Id.)

8   51.   On June 1, 2020 and June 5, 2020, Schoen emailed and called the
9  Malibu City Attorney, Trevor Rusin, advocating for an interpretation of the one-
10  story restriction that was inconsistent with the plain and ordinary meaning of one
11  story.  (Trial Ex. 50; 12/5 Tr. Vol. I 100:13-101:16, 105:12-106:3.)  Rusin gave
12  Trustees the option of either working with the owner of Lot 17 to "clean up the
13  deed restriction language" or submit a letter from an attorney explaining how
14  Trustees' plans, including the second story bedroom, comply with the 1994
15  Restrictive Covenant.  (Trial Ex. 109.2 at 1–2.)

16   52.   Trustees chose to obtain a letter from an attorney rather than
17  contacting the non-resident owner of Lot 17, LaSalle Development, Inc.  (Id. at 2;
18  Schoen Decl. ¶ 24; 12/5 Tr. Vol. II 7:9-8:15.)

19   53.   On June 12, 2020, Trustees' attorney, Justin Block, sent a letter to the
20  City's Planning Director stating that as long as Trustees' residence did not exceed
21  18 feet, it complied with the terms of the 1994 Restrictive Covenant.  (Trial Ex.
22  52.)

23   54.   The project descriptions contained in the City's August 6, 2020
24  Notice of Application for Administrative Coastal Development Permit No. 19-101
25  (Trial Ex. 111) and the August 27, 2020 Notice of Decision for Administrative
26  Coastal Development Permit No. 19-101 (Trial Ex. 112), which purportedly
27  describe the scope of Trustees' construction project, omit any reference to a two-
28  story home.  The project description states that the project is "a new 18 foot tall,

5,461 square-foot single-family residence, including a 578 square-foot attached second unit, 855 square-foot swimming pool and spa, landscape, hardscape, retaining walls, grading, and installation of a new onsite wastewater treatment system, including a site plan review for construction on slopes between 3 to 1 and 2.5 to 1, and a minor modification for a 20 percent reduction of the required rear yard setback." (Trial Exs. 111, 112.)

55.    The City's October 12, 2020 Notice of Final Action on Coastal Permit for Trustees project did not disclose that Trustees would be constructing a second-story unit above the garage on their property. (Trial Ex. 113.)

56.    Before the issuance of a building permit for Lot 16 and commencement of Trustees' construction of a two-story home, Trustees knew that the 1994 Restrictive Covenant prohibited them from constructing any improvements greater than one story on their property.

57.    Shortly after, Trustees began construction on their property in June 2021. (Schoen Decl. ¶¶ 34–35.)

58.    Trustees constructed a second-story unit on their property. (Trial Exs. 20, 30, 68; 12/5 Tr. Vol. I 30:14-24.)

59.    The garage that Trustees are constructing on their property is a first-story improvement. The second dwelling unit that Trustees are constructing above the garage is a second-story improvement.

60.    Trustees' construction of the second-story dwelling unit on their property violates the one-story limitation set forth in Article II, Section 3 of the 1994 Restrictive Covenant. (12/5 Tr. Vol. I 17:5-11.) Thus, Trustees understood that their construction exceeded the plain and ordinary meaning of "one story," as stated in the 1994 Restrictive Covenant. (Id. at 71:8-12.)

F.    **Morning Star's Planting of Ficus**

61.    Around March 2022, Morning Star planted new Ficus plants ("New Ficus") to the west of the Old Ficus along its north property line. (Supplemental

14

Declaration of Patrick Nazemi ("Nazemi Suppl. Decl."), Dkt. No. 163, ¶¶ 11–12.) Nazemi's denial that he ever caused the planting of additional Ficus plants was not credible.  The planting of the New Ficus violates Article II, Section 2 of the 1994 Restrictive Covenant because the landscaping is on the northerly ten feet of Morning Star's Property.

62.    Morning Star was concerned about privacy and security.  (Nazemi Decl. ¶¶ 65–70.)

63.    Nazemi read the contents of the 1994 Restrictive Covenant.  (Id. ¶¶ 26–27.)

64.    Morning Star planted the New Ficus without obtaining a permit from the City of Malibu.  (Nazemi Suppl. Decl. ¶¶ 11–12.)

65.    Trustees filed a formal complaint with the City of Malibu in March 2022, stating that Morning Star had planted the New Ficus without a permit.  (Trial Ex. 118.)

66.    On March 17, 2022, the City of Malibu issued a Notice of Violation to Morning Star regarding the New Ficus.  (Trial Ex. 121.)

67.    Morning Star did not apply to the City of Malibu for a permit to plant the New Ficus until June 2022.  (Nazemi Suppl. Decl. ¶ 12.)

68.    The City of Malibu determined that none of the Ficus trees comprising the hedge along the northern boundary of Lot 17 had been approved by the City and requested that Morning Star's proposed landscape plan include all the Ficus trees and not just the recently planted Ficus trees.  (Trial Ex. 125 at 1–2.)

69.    On July 7, 2022, the City of Malibu Biologist approved Morning Star's landscape plan for the Ficus hedge along its northern property line subject to several conditions including the following:

C.    Vegetation forming a view impermeable condition (hedge), serving the same function as a fence or wall, occurring within the side or rear yard setback shall be

15

maintained at or below six feet in height.  View impermeable hedges occurring within the front yard setback serving the same function as a fence or wall shall be maintained at or below 42 inches in height.

(Trial Ex. 38.)

70.     On December 8, 2022, Trustee's attorney sent a letter to the City Planner reviewing Morning Star's landscape plan application, citing the Lot 17 landscape restrictions in the 1994 Restrictive Covenant and urging the City to order the removal of the Ficus trees.  (Trial Ex. 120-1.)

71.     On January 24, 2023, the City of Malibu approved OC 22-169 for Morning Star's landscape plan subject to the conditions of the City Biologist and with a notation on the permit, which reads: "ENTIRE Hedge must be maintained at 6 feet or less for compliance with Malibu MMC (17.40.030.A)."  (Trial Ex. 39.)

72.     On March 2, 2023, the City of Malibu cited Morning Star for a violation of OC 22-169 and demanded that Morning Star comply with the conditions of that permit by March 15, 2023.  (Trial Ex. 126.)

73.     The Ficus trees in Morning Star's rear yard along its common property line with Trustees' Property exceeds the six-foot height limit.  (Trial Ex. 123.)

74.     The Court finds that Morning Star violated Article II, Section 2 of the 1994 Restrictive Covenant.

## IV. CONCLUSIONS OF LAW

### A.     The Meaning of the 1994 Restrictive Covenant

75.     Absent a finding that the term "story" has a specific technical meaning, the plain meaning should apply.  See King v. Kugler, 197 Cal. App. 2d 651, 655 (1961) (noting that "one story" does not have a technical or special meaning, and should thus be "interpreted in its ordinary and popular sense rather than according to some strict legal or technical meaning").  Under this standard,

16

the ordinary meaning of "story" is simply a structure with a floor and a ceiling.
See id. (finding that "to have a garage floor and ceiling and a room with a floor and
ceiling above the garage" constituted two stories). The Court finds "nothing
vague, ambiguous or uncertain in the meaning of the restrictive phrase 'one
story[],' or as to what was intended thereby." Id. Because the Court finds that the
term "one story" is clear and unambiguous, the plain meaning of "one story"
applies.

76.   Given the plain meaning of "one story," Trustees' second-story unit
violates Article II, Section 3 of the 1994 Restrictive Covenant.

## B.   Strict Enforcement of the 1994 Restrictive Covenant

77.   California provides for strict enforcement of restrictive covenants.
Walker v. Haslett, 44 Cal. App. 394, 398 (1919) ("When clearly expressed,
covenants of this description will be strictly enforced, and a court of equity will
decree an injunction, and this without any showing of actual damage or substantial
injury."); see also Nahrstedt v. Lakeside Vill. Condo Ass'n, 8 Cal. 4th 361, 382
(1994).

78.   In King, the California Court of Appeal upheld a permanent
injunction enjoining construction of a second-story unit as violative of a restrictive
covenant that prohibited any structure "exceed[ing] 'one story in height.'" 197
Cal. App. 2d at 655–56. As stated above, Trustees' second-story unit violates the
plain terms of the 1994 Restrictive Covenant. The 1994 Restrictive Covenant "will
be" strictly enforced unless a narrow exception applies. See Nahrstedt, 8 Cal. 4th
at 381–82. The evidence shows that Trustees had both constructive and actual
knowledge of the one-story restriction in the 1994 Restrictive Covenant before
commencing construction and obtaining a building permit.

79.   Before starting construction on their property, Trustees received a
Preliminary Title Report that listed the 1994 Restrictive Covenant as an exception
to coverage, an Incomplete Letter that quoted the one-story restriction in the 1994

17

Restrictive Covenant, and emails from the City reiterating the 1994 Restrictive
Covenant's one-story restriction.

80.   Trustees proceeded to build the second-story unit in violation of the
1994 Restrictive Covenant.

81.   "An equitable servitude will be enforced unless it violates public
policy; it bears no rational relationship to the protection, preservation, operation or
purpose of the affected land; or it otherwise imposes burdens on the affected land
that are so disproportionate to the restriction's beneficial effects that the restriction
should not be enforced." Nahrstedt, 8 Cal. 4th at 382.

82.   The Court previously found that the 1994 Restrictive Covenant's
second-story restriction does not violate public policy and bears a rational
relationship to the protection, preservation, operation or purpose of the affected
land.  (Summary Judgment Order, Dkt. No. 121, at 16.)  Thus, the Court found that
"only the third exception, whether the restriction imposes burdens on the affected
property that are so disproportionate to its beneficial effects, is at issue." (Id.)

83.   When a mandatory injunction of this variety is at issue, equity
sometimes counsels the Court to assess the result's reasonableness under the
circumstances.  In particular, where, "by innocent mistake or oversight, buildings
erected . . . slightly encroach . . . and the damage to the owner of the buildings by
their removal would be greatly disproportionate to the injury . . . the court may
decline their removal." Morgan v. Veach, 59 Cal. App. 2d 682, 690 (1943)
(quoting 28 Am. Jur., Section 56, p.253).  Conversely, "where it appears that the
defendant acted with a full knowledge of the complainant's rights and with an
understanding of the consequences which might ensue," an injunction "will not be
denied on the ground that the loss caused by it will be disproportionate to the good
accomplished." Id.

84.   Trustees have failed to present sufficient evidence to show that they
did not knowingly or wilfully violate the 1994 Restrictive Covenant's second-story

prohibition.

85.    Trustees knew of the 1994 Restrictive Covenant and its second-story prohibition.  Trustees knew that their second-story unit violated the plain meaning of the 1994 Restrictive Covenant.  Thus, the narrow exception of <u>Nahrstedt</u> does not apply to the 1994 Restrictive Covenant's second-story prohibition.

86.    Moreover, the second-story unit was not an "innocent mistake" or a "sight encroachment" in violation of the 1994 Restrictive Covenant.  It is a full story that is in excess of the one-story limit.

87.    The standard for determining whether a permanent injunction should be granted is essentially the same as the standard for a preliminary injunction, except that the court determines the plaintiff's success on the merits rather than the plaintiff's likelihood of success on the merits.  <u>Amoco Prod. Co. v. Vill. of Gambell</u>, 480 U.S. 531, 546 n.12 (1987).

88.    Trustees' second-story unit violates the plain terms of the one-story limit in the 1994 Restrictive Covenant.

89.    Morning Star's planting of New Ficus violates the plain terms of the landscaping provision in the 1994 Restrictive Covenant.

90.    To obtain a permanent injunction, a plaintiff must demonstrate "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  <u>eBay Inc. v. MercExchange, L.L.C.</u>, 547 U.S. 388, 391 (2006).  The Court's "decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court."  <u>Id.</u>

91.    First, Morning Star and Trustees are "likely to suffer irreparable harm in the absence of [permanent] relief."  <u>Karnoski v. Trump</u>, 926 F.3d 1180, 1198

(9th Cir. 2019) (quoting <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S. 7, 20 (2008)). California law recognizes that violation of a property right itself constitutes irreparable harm. <u>See, e.g.</u>, <u>Clear Lake Riviera Cmty. Ass'n v. Cramer</u>, 182 Cal. App. 4th 459, 473 (2010) (acknowledging the risk and harm associated with "refusing injunctive enforcement" of a community association's height restriction); <u>see also</u> <u>Joyce v. Krupp</u>, 83 Cal. App. 391, 398–99 (1927) (noting that a covenant violation is significant enough to entitle a plaintiff to permanent injunctive relief at the merits stage); <u>Walker</u>, 44 Cal. App. at 398 (same).

92.  Second, the Restatement (Third) of the Law of Property states:

> Injunctive relief is normally available to redress violations of easements and restrictive covenants without proof of irreparable injury or a showing that a judgment for damages would be inadequate. The value of a restrictive covenant or easement is often difficult to quantify and may be impossible to replace. When it is enjoyed as an appurtenance to ownership of land, its value to the land owner may not be adequately reflected by market values. An award of damages instead of injunctive relief that would allow the other party to buy out of the servitude obligation will seldom be appropriate so long as the servitude continues to serve the purpose contemplated at its creation.

Restatement (Third) of Prop. (Servitudes) § 8.3, cmt. b, pp. 495–96. Moreover, as previously stated, the California Court of Appeal upheld a permanent injunction enjoining construction of a second-story unit as violative of a restrictive covenant that prohibited any structure "exceed[ing] 'one story in height.'" <u>King</u>, 197 Cal. App. 2d at 655–56; <u>see also</u> <u>Nahrstedt</u>, 8 Cal. 4th at 381–82 (finding that restrictive covenants "will be" strictly enforced unless a narrow exception applies).

20

93.     Third, the balance of the hardships weighs in favor of injunctive relief.  As previously stated, under California law, courts must "strictly enforce[]" restrictive covenants absent extraordinary circumstances.  Morgan, 59 Cal. App. 2d at 690–91 (citation omitted); see also Nahrstedt, 8 Cal. 4th at 380–82.

94.     The Court declines to address the fourth Winter factor—whether the permanent injunction is in the public interest—because this factor is "at most a neutral factor in the analysis" where "the reach of an injunction is narrow, limited only to the parties, and has no impact on nonparties."  See Stormans, Inc. v. Selecky, 586 F.3d 1109, 1138–39 (9th Cir. 2009) (citation omitted).

95.     Thus, the Court strictly enforces Article II, Section 2 of the 1994 Restrictive Covenant against Morning Star.  The Court also strictly enforces Article II, Section 3 of the 1994 Restrictive Covenant against Trustees.

## C.     The Unclean Hands Defense

96.     Unclean hands is an equitable defense under California law.  "He must come into court with clean hands, and keep them clean, or he will be denied relief, regardless of the merits of his claim."  Meridian Fin. Servs., Inc. v. Phan, 67 Cal. App. 5th 657, 685 (2021) (quoting Kendall-Jackson Winery, Ltd. v. Superior Court, 76 Cal. App. 4th 970, 978 (1999)).

97.     However, "[n]ot every wrongful act constitutes unclean hands."  (Id.) "Under the 'unclean hands' doctrine, a party is barred from relief if he has engaged in any unconscientious conduct directly related to the transaction or matter before the court."  DeRosa v. Transamerica Title Ins. Co., 213 Cal. App. 3d 1390, 1395 (1989).

98.     "The misconduct that brings the unclean hands doctrine into play must relate directly to the cause at issue.  Past improper conduct or prior misconduct that only indirectly affects the problem before the court does not suffice.  The

determination of the unclean hands defense cannot be distorted into a proceeding to try the general morals of the parties." Kendall-Jackson Winery, 76 Cal. App. 4th at 979.

99.    "The misconduct must relate directly to the transaction concerning which the complaint is made, i.e., it must pertain to the very subject matter involved and affect the equitable relations between the litigants.  [T]here must be a direct relationship between the misconduct and the claimed injuries . . . so that it would be inequitable to grant [the requested] relief. . . . The issue is not that the plaintiff's hands are dirty, but rather that the manner of dirtying renders inequitable the assertion of such rights against the defendant.  The misconduct must prejudicially affect . . . the rights of the person against whom the relief is sought so that it would be inequitable to grant such relief." Id. (internal quotation marks and citations omitted)).

100.    "The fact that a plaintiff at the time of receiving an injury is doing an act in violation of the law is not an excuse for the defendant who has negligently caused the harm . . . ." Blain v. Doctor's Co., 222 Cal. App. 3d 1048, 1059 (1990) (internal quotation marks and citation omitted).

101.    "Whether the particular misconduct is a bar to the alleged claim for relief depends on (1) analogous case law, (2) the nature of the misconduct, and (3) the relationship of the misconduct to the claimed injuries." Kendall-Jackson Winery, 76 Cal. App. 4th at 979 (quoting Blain, 222 Cal. App. 3d at 1060).

102.    Here, Morning Star's violation of the landscaping provision in Article II, Section 2 of the 1994 Restrictive Covenant is unrelated to Trustees' violation of the one-story restriction in Article II, Section 3 of the 1994 Restrictive Covenant.

103.    Moreover, Trustees' injury regarding their oceanic view due to Morning Star's violation does not relate to Morning Star's privacy injury due to Trustees' violation.

104.   Morning Star's planting and maintenance of the Ficus trees is thus unrelated to Trustees' second-story unit and the injuries resulting therefrom.

105.   Lastly, neither Morning Star nor Trustees have provided any analogous case law to support their unclean hands defense.

106.   The Court concludes that Morning Star is not entitled to an unclean hands defense regarding the landscaping provision.

107.   The Court concludes that Trustees are not entitled to an unclean hands defense with respect to the violation of the one-story restriction.

23

## V. CONCLUSION

For the reasons stated above, the Court enters its findings of fact and conclusions of law as stated herein.  Plaintiff and Defendants shall file a proposed judgment forthwith.  Plaintiff and Defendants shall file any objections thereto within 7 days of the other party's filing.  If no objections are received within 7 days, the judgment will be entered immediately, and Federal Rule of Civil Procedure 52(b) will apply upon entry of judgment.  The Court reserves for post-judgment consideration the issue as to the identity of the prevailing party(ies) for purposes of the attorneys' fee provision of the 1994 Restrictive Covenant and the amount of any such award.  (Trial Ex. 1, Art. III, § 3.)

**IT IS SO ORDERED.**

Dated: April 25, 2024

JAMES V. SELNA
UNITED STATES DISTRICT JUDGE